IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| STEPHEN MCKITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:12-cv-673-WHA |
| | ) | (WO) |
| ALABAMA ALCOHOLIC BEVERAGE | ) | |
| CONTROL BOARD and JEFF ROGERS, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.    INTRODUCTION**

This matter is before the court on a Motion for Summary Judgment filed by Defendants Alabama Alcoholic Beverage Control Board ("ABC Board" or "Board") and Jeff Rogers ("Rogers") on June 28, 2013. Plaintiff Stephen McKitt ("McKitt") filed his Complaint on August 6, 2012. The Defendants seek summary judgment on all counts of the Complaint.

The court has federal question subject matter jurisdiction over these claims. *See* 28 U.S.C. § 1331.

For the reasons to be discussed, the Defendants' Motions for Summary Judgment are due to be **GRANTED**.

**II.    SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

2

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III.   FACTS

Based on submissions of the parties, the following is an account of relevant facts with all justifiable inferences drawn in favor of the Plaintiff:

#### The ABC Board's Policies and Personnel Process

The Plaintiff in this case is an employee of the ABC Board. As an agency of the State of Alabama, the ABC Board is subject to the rules and regulations of the State Personnel Department ("SPD"). Both the SPD and the ABC Board have policies that prohibit discrimination against any employee or applicant based on race. The ABC Board's policy states that any employee or applicant may file a discrimination complaint with the ABC Board. The ABC Board also has a policy that requires employees to testify as needed in conjunction with pre-discipline or grievance hearings. Any employee that refuses to testify or that harasses another employee may be subject to discipline, including dismissal.

The SPD manages the recruitment and testing procedures for all of the ABC Board's merit-system jobs. A candidate seeking a job or a promotion must first submit an application for examination with the SPD. If the candidate meets the job classification's minimum qualifications, the SPD either administers an examination or scores the candidate based on

experience. The SPD then prioritizes the candidate's name on the job classification's hiring/promotion register according to the candidate's score.

When the ABC Board has a job vacancy, the SPD provides the ABC Board with a Certificate of Eligibles, made up of the top ten names, plus ties, from the hiring register. A candidate may remove himself or herself from the register for any reason. In addition, a candidate may be removed if he or she has noted a restriction, such as an unwillingness to move to a particular geographic location.

To be eligible to receive a promotion, a candidate must 1) rank in the top ten, plus ties, of the hiring register, 2) rank in the top half of the register and successfully perform the current job classification at a higher level for more than three months (the "Upper 50 Rule"), or, 3) having been unable to be in the top ten, plus ties, or the upper fifty percent of the register, perform the job at a particular level for five years or more (the "Five Year Rule"). For promotion through the Upper 50 Rule or the Five Year Rule, the employee's position is analyzed for reallocation. For reallocations, the ABC Board submits a position classification questionnaire to the SPD's Classification and Pay Division Manager. Using the questionnaire, the manager then decides whether reallocation is warranted for the particular position. If the questionnaire is insufficient, the SPD may require a desk audit to observe the job personally in making its decision. Ultimately, the SPD's Classification and Pay Division Manager makes the reallocation decision. If reallocation is warranted, the employee is promoted to a higher classification. If reallocation is unwarranted, the employee remains at his or her current classification.

Plaintiff Stephen McKitt

Stephen McKitt, an African-American male, applied for an ABC Enforcement Agent position on May 21, 1993. At the time, he was working as a Deputy Sheriff with the Montgomery County Sheriff's Department. On May 16, 1994, the ABC Board hired McKitt as an Enforcement Agent I, with May 31, 1994 as the effective date. He was initially assigned to work in Anniston, Alabama, but he was transferred to the District Ten office in Montgomery, Alabama on March 16, 1996. McKitt has remained in the District Ten office since his 1996 transfer, with the exception of a seven-month period working at the ABC warehouse in Montgomery.

The parties submitted into evidence four applications requesting promotion of McKitt from agent to sergeant during his employment with the Board. Sergeant is the only promotion available within the Enforcement Division for an Enforcement Agent. On April 27, 2004, he applied for promotion to sergeant and listed his availability as statewide. On March 1, 2006, an application was submitted for promotion to sergeant that once again listed McKitt's availability statewide. On March 3, 2009, McKitt submitted another application for promotion to sergeant, but this application listed his availability as limited to Autauga, Elmore, Lowndes, Montgomery, Blount, Cullman, Jefferson, Shelby, St. Clair, Chilton, Dallas, Perry, and Wilcox Counties. Finally, on March 27, 2012, McKitt submitted an application for promotion to sergeant that listed his availability as restricted to those same counties.

On June 26, 2008, Defendant Chief Rogers, a white male who was, and is, Chief of the ABC Enforcement Division and thus McKitt's top supervisor in the Enforcement Office, received a complaint from McKitt's white male neighbor that McKitt was frequently at home during business hours. In response, Rogers initiated an internal affairs investigation through Captain Vance Patton ("Patton"), a white male. To determine whether McKitt was traveling to

his home during work hours, Patton installed a Global Positioning System ("GPS") device on McKitt's state-issued vehicle to track McKitt's movements. At the end of the investigation, Patton noted that "Agent McKitt's activity showed no unusual movements to substantiate the [neighbor's] complaint being valid." (Doc. # 40-14 at 4.) The investigation ended and no subsequent actions were taken. McKitt believed the investigation to be racial harassment "because a white guy down the street complained on [him]." (Doc. # 39-1 at 283:9–12.) Furthermore, in 2011, McKitt was offended when Rogers told a statewide meeting that McKitt had been tracked with a GPS. (Doc. # 39-1 at 97:18–98:22.)

On September 8, 2008, Rogers sent McKitt a fitness-for-duty form and asked McKitt to return the completed form by September 12, 2008. McKitt had been excused from "physical training until further notice" on October 23, 2007 due to ongoing chemotherapy treatments. (Doc. # 40-18 at 2.) Patton sent McKitt home in order to have McKitt's physician fill out the form. On September 9, 2008, McKitt returned the completed fitness-for-duty form.

In December of 2008, both McKitt and another African-American agent, Stacy Taylor ("Taylor"), were assigned to one-week terms at the ABC warehouse. McKitt's supervisor at the time, Lieutenant Dennis Hill ("Hill"), a white male, told McKitt and Taylor that they were being assigned to the warehouse because they had not been performing their job duties and because their statistics were too low. Taylor disagreed with Hill that his and McKitt's statistics were too low, and he pointed to agent rankings that showed McKitt and Taylor in the middle range of all agents statewide. One white male agent, Mark Barber ("Barber") was ranked lower than both McKitt and Taylor, but he was not assigned to a one-week warehouse assignment. Taylor complained that the assignments were racially motivated, and Hill communicated this concern to

6

the Central Office. Despite Taylor's concern, McKitt and Taylor were required to fulfill their one-week warehouse assignments.

As mentioned, McKitt submitted an application for promotion from agent to sergeant on March 3, 2009. Another agent, Scottie Chandler ("Chandler"), was promoted to sergeant off of a Certificate of Eligibles generated by the SPD on February 27, 2009, a few days before McKitt's application. McKitt was on this Certificate of Eligibles. However, McKitt was listed in Band Two on the Certificate while Chandler was listed in Band One. Darick Wilson ("Wilson") was promoted from agent to sergeant off of a Certificate of Eligibles generated on May 12, 2009. Neither McKitt nor any other African-American agent was on the May 12, 2009 Certificate of Eligibles. Finally, Jonathan Winters ("Winters"), a white male, was promoted off of a February 23, 2009 Certificate of Eligibles to sergeant for the Jefferson County office. McKitt was not on the February 23, 2009 Certificate for the Jefferson County position.

On June 9, 2009, Taylor was notified that he was suspended for failing to report an unusual incident to his supervisor. Taylor had been involved with a fight between his ex-wife and his girlfriend. Taylor reported the incident to his immediate supervisor, Hill, but the Board suspended him anyway. McKitt was aware of Taylor's suspension during this time.

On October 23, 2009, after Hill complained of corruption in the ABC Board's Central Office, Rogers transferred Hill from District Ten to the Central Office. Rogers then assigned Jean Turner ("Turner"), a white female, as the acting supervisor for District Ten, and she became the supervisor of McKitt. Turner had the reputation of terminating employees that Rogers or then-Administrator Emory Folmar ("Folmar") wanted removed. (Doc. # 39-3 at 580:10–14.) When Turner arrived, she told Valencia Aaron ("Aaron"), an African-American female agent, that "[she] was not [there] to get [Aaron]." (Doc. # 39-3 at 580:14–16.) Aaron interpreted this to

mean that Turner was at District Ten to terminate Taylor and McKitt, and she communicated this concern to McKitt. During the following two months that Turner supervised District Ten, McKitt felt as though he and Taylor were targeted. (Doc. # 39-1 at 148:22–149:13.)

Around the time Turner became supervisor, Agent Richard Holston ("Holston"), a white male, was transferred to District Ten. Holston requested the transfer to be close to his grandmother, who was ill. However, once he arrived, Holston told Aaron that Rogers and her main District Ten supervisor, Lieutenant Kenneth Davis ("Davis"), a white male, had instructed him to keep watch over Aaron. He also said that he "knew people thought he was a 'mole' and there to 'snitch' on other employees." (Doc. # 38 at 21–22; Doc. # 39-3 at 301:18–302:22.) Aaron told McKitt of Holston's statements.

At about 10:45 A.M. on the morning of November 6, 2009, McKitt left the office for his approved one-hour workout. A few minutes after noon, McKitt returned to the office after eating a sandwich in his car. Only Winters and McKitt were in the office when McKitt returned. Winters contacted Turner over the radio during Turner's lunch break to tell her that McKitt was sleeping on the job. Turner instructed Winters to record McKitt sleeping, and Winters did. McKitt disputes that he slept at any other time while at the office. (Doc. # 39-1 at 334:18–21.)

Turner reprimanded McKitt on November 23, 2009 for the stated reason of sleeping on the job. McKitt accepted the reprimand because he did not feel like he could win a dispute. That same day, Turner, Davis, and McKitt discussed McKitt's health problems. In the meeting, the group discussed a medical appointment that McKitt had the following morning. Davis told McKitt not to return to work until he submitted a list of his medications. (Doc. # 39-1 at 253:14–17.) Despite this demand, McKitt was able to return to work the next day without turning in the list. (Doc. # 39-1 at 253:20–23.)

On Turner's recommendation, Davis sent McKitt to work full-time in the warehouse beginning on December 7, 2009. The assignment lasted for seven months and was in response to McKitt's reprimand for sleeping on the job. Warehouse assignments were considered punitive because the warehouse was dirty, cold in the winter, and hot in the summer. Despite seeing white agents use a golf cart and office at the warehouse, McKitt was told by Davis that he could not use either. McKitt believed the assignment was racial harassment. (Doc. # 39-1 at 281:23– 282:7.) On December 9, 2009, Turner told Taylor that she was recommending he be transferred to Dothan for not having made enough cases. Taylor ultimately resigned on January 25, 2010.[1]

On January 12, 2010, Chris Gruhn, identified either as a white or Asian-American male, was promoted to sergeant. Both Gruhn and McKitt were listed in Band Two on the Certificate of Eligibles. Personnel Director Stan Goolsby ("Goolsby"), a white male, testified that then-Administrator Emory Folmar recommended that Goolsby promote Gruhn. As a result, Goolsby promoted Gruhn.

On January 21, 2010, Davis sent an email to the entire District Ten Enforcement Division asking that all agents keep an hourly log of their activities. (Doc. # 42-19 at 2.) Some months after the policy went into effect, Davis called Aaron and McKitt into his office to discuss a four-minute discrepancy in their time logs from an inspection they had performed together. Furthermore, during the time following Aaron's Charge, McKitt noticed that Davis was scrutinizing his work more heavily.

---

[1] Taylor's resignation was the source of controversy for another opinion issued by this court. *Perry v. Ala. Beverage Control Bd.*, Civil Action No. 2:11-cv-464-WHA. As discussed by McKitt in this case, Taylor wished to rescind his resignation letter almost immediately after submitting it. Ultimately, Taylor's resignation letter was not rescinded, and Taylor's employment ended with the ABC Board.

On May 29, 2010, Jason Roberts ("Roberts"), a white male, was promoted to sergeant. Both McKitt and Roberts were listed in Band Two on the Certificate of Eligibles from which Roberts was selected. Rogers, Patton, and a lieutenant selected Roberts for promotion without holding interviews.

On July 8, 2010, Chandler was promoted from sergeant to lieutenant. On July 13, 2010, Wilson was promoted from sergeant to lieutenant. Both positions were reallocated through the SPD. Chandler's promotion allowed Wilson to advance onto the next Certificate of Eligibles, thus enabling Wilson to be promoted. In addition, another white sergeant took his name off the register in order to allow Wilson to be promoted.[2] Both promotions were something "the Administrator wanted done immediately." (Doc. # 39-10 at 60:21–23.) The highest ranked candidate on the list was an African-American, but he was not chosen.

On August 8, 2010, following the arrest of Lieutenant Andy Lard ("Lard"), an African-American, Captain John Richardson ("Richardson"), an African-American, met with McKitt to discuss McKitt's job duties. Richardson told McKitt that "he was going to give [McKitt] a couple months to get [himself] together and he was going to be watching [McKitt]." (Doc. # 39-1 at 197:7–9.)

On August 9, 2010, Aaron and Kesia Perry ("Perry"), an African-American administrative assistant for the Board, traveled to Birmingham and filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). In her Charge, Aaron mentioned the Board's use of a GPS on McKitt's state-issued vehicle. On August 10,

_____

[2] McKitt believed that the Board racially discriminated against him by allowing the white sergeant to remove his name from the registry, thus enabling Wilson's promotion. The white sergeant was later promoted to lieutenant after an African-American lieutenant, Andy Lard, was arrested at the Central Office. McKitt was "aware of the rumor that Chief Rogers stated there was [an 'n-word'] he was trying to get rid of and wanted to replace with [the white sergeant]." (Doc. # 38 at 34; *see also* Doc. # 39-1 at 409:12–22.)

2010, Aaron filed a race discrimination grievance with the SPD. On August 12, 2010, the EEOC sent the ABC Board a Notice of Aaron's Charge of Discrimination. Aaron stated that, after she filed her Charge, she was subjected to surveillance by the Board.

The SPD held a hearing on Aaron's grievance on December 16, 2010. McKitt testified at the hearing in support of Aaron. The next day, Davis held a meeting with the District Ten agents and announced a list of policy changes. Among those changes was a requirement that all personnel be finished with breakfast by 8:00 A.M. A few days before, Davis had seen McKitt and Aaron having breakfast together in the break room. Despite several times in the past when Davis had seen white agents eating breakfast in the break room and said nothing, Davis told Aaron and McKitt that they would no longer be able to have breakfast together. To McKitt, Davis' new policy was another example of harassment.

On January 4, 2011, Davis sent a memorandum to all District Ten Enforcement personnel announcing several changes. (Doc. # 42-22 at 2–3.) In that memorandum, McKitt was reassigned from working in Montgomery County to Bullock County. Montgomery County was assigned to a white agent with less seniority. McKitt believed this assignment was harassment.

On January 7, 2011, McKitt attended the normal District Ten meeting. During the meeting, Davis asked everyone to express their opinions on how the office was being run. In response, Aaron told Davis that she thought his actions were retaliatory. The next day, January 8, 2011, Rogers sent an email to Davis stating that Aaron was being disruptive and that her conduct in the workplace was making other employees uncomfortable. Later that day, Rogers announced his intent to have Aaron "written up" for her actions. (Doc. # 42-30 at 2.) A final counseling form was submitted on January 21, 2011. Aaron submitted a rebuttal on January 26, 2011 that stated she did not consider her actions disruptive.

On July 28, 2011, the Board promoted Agent Phillip Myers ("Myers"), a white male, to sergeant in District Ten. Myers was listed in Band One on that Certificate, while McKitt was listed in Band Two. (Doc. # 42-39 at 2–3.) On July 29, 2011, Agent Paul Hayes ("Hayes"), a white male, was promoted to sergeant in Birmingham. Both Hayes and McKitt were listed in Band Two of that Certificate. Hayes and Myers were chosen after interviews with all applicants were held. The promotions were announced in an email from Rogers on August 31, 2011.

On October 27, 2011, McKitt filed an EEOC Charge of Discrimination based on continuing race discrimination and retaliation.

Throughout 2011, McKitt states he was continuously harassed. Davis continued to criticize McKitt for minor issues with his paperwork. At one point, Holston stated that he was "sick and tired of people that don't think they have to do nothing just because they file lawsuits." (Doc. # 39-1 at 150:22–151:7.) Collins counseled McKitt on July 29, 2011 after McKitt used an expletive during a conversation in which Collins told McKitt that McKitt needed to miss a personal obligation to work. On August 23, 2011, Holston submitted a grievance letter to Davis that stated he had "expressed [his] concern and disapproval [of McKitt's lower level of work than that of white agents] to [Sergeant] Collins on several occasions when other agents were present." (Doc. # 43-5 at 2.) On September 13, 2011, Davis gave McKitt a performance appraisal in which McKitt was rated as meeting standards. Richardson subsequently counseled McKitt about this performance appraisal, and McKitt filed a rebuttal on September 21, 2011. That day, Rogers met with McKitt to discuss McKitt's rebuttal. At that meeting, Rogers quoted a line from the movie *Full Metal Jacket* that contains the "n-word" and other racial epithets. Rogers contends that the quotation was an effort to convince McKitt that Rogers did not make promotion decisions based on race. McKitt believed all of these events to be harassment.

12

On November 23, 2011, Agents Gary Humphrey ("Humphrey") and Wayne Mackey ("Mackey"), both white males, were promoted to sergeant positions. Humphrey, Mackey, and McKitt were all ranked in Band Two. On December 1, 2011, the Board announced Collins' promotion to Lieutenant. On December 5, 2011, Lieutenant William Carson ("Carson"), an African-American, announced that all of the District Ten Enforcement Agents would have the opportunity to serve as acting sergeant for one-week terms. That same day, Rogers sent Carson an email stating that "Carson's idea may be offensive to [sergeant] candidates that may be considered for [District Ten] who are currently working in other districts." (Doc. # 41-17 at 2.) Rogers instructed Carson to "provide [a] memorandum to all [Carson's] agents and [copy Rogers] stating that those in acting [sergeant] positions or 'training' to be [sergeants] in [District Ten] will have no more advantage for consideration than someone else from another district." (*Id.*) Carson followed through with this request on December 6, 2011.

On July 16, 2012, Holston was promoted to sergeant in District Ten.[3] McKitt was not on the Certificate of Eligibles for this position. On July 17, 2012, Carson notified Richardson and Rogers that he had "been met with significant opposition" to Holston's promotion. (Doc. # 43-19 at 2.) McKitt filed this suit on August 6, 2012. Richardson met with District Ten personnel on August 13, 2012 and explained the promotion process. In a memo he wrote on August 13, 2012 to describe the meeting, he noted that everyone in "the group said their previous concerns [had] been discussed and worked out with [Sergeant] Holston and [that] they [would] support him as their immediate supervisor." (Doc. # 43-21 at 2.)

---

[3] Although not discussed by McKitt, the Board promoted George Cook, an African-American, to a sergeant position in Jefferson County at the same time it promoted Holston. McKitt was not on either Certificate of Eligibles. (Doc. # 27-1 ¶ 53.) However, McKitt expressed availability in both Montgomery and Jefferson Counties. (Doc. # 40-13 at 18.)

Finally, on October 29, 2012, in response to an email from Rogers reminding everyone that they could not take adverse actions against McKitt or Aaron, Holston wrote a memorandum to his file that discussed two interactions between himself and Aaron. First, Aaron was scheduled to work at a store in Auburn on October 17, 2012. That morning, Collins contacted Holston because Aaron had not arrived at her assigned store. Holston then contacted Aaron and told her that Collins was looking for her. Second, Holston contacted Aaron about a payment request on October 29, 2012. Holston believed the payment request should have been higher than what Aaron had reported. According to Holston, "Agent Aaron was noticeably aggravated at being questioned." (Doc. # 43-23 at 2.) As part of that conversation, Holston "checked the agents manual and discovered that there is no standard, but that agents need to have their payment amounts approved." (*Id.*) During this discussion, Holston felt threatened by Aaron.

## IV.    DISCUSSION

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits employers for retaliating against any employee "because he has opposed any [...] unlawful employment practice [...] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000-3(a). The Supreme Court in *McDonnell Douglas Corp. v. Green* provided the traditional framework for evaluating cases where, as here, a plaintiff only offers circumstantial evidence in support of his or her retaliation and discrimination claims. Under this framework, the

14

plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the employer has met this "exceedingly light" burden, the "plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000). That is, even if a plaintiff establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered reasons, summary judgment "will sometimes be available to an employer in such a case." *Chapman v. AI Transp.*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).

## A.  Count I

In McKitt's first count of his Complaint, entitled "Plaintiff Stephen McKitt's claims of Race Discrimination and Race Harassment against the ABC Board (State of Alabama) in

Violation of Title VII," McKitt alleges that he "has been discriminated against on the basis of his race in violation of Title VII in promotions, pay, job and work assignments, discipline, evaluations, transfers and in all other terms and conditions including a hostile environment because of racial harassment by his employer, the ABC Board (State of Alabama)." (Doc. # 1 ¶ 58.)

McKitt limits his argument under Count I to a discussion of numerous promotions claims and a hostile work environment claim. McKitt also sets forth several allegations concerning his lengthy warehouse assignment from December 2009 to June 2010. The Board, by contrast, asserted a number of arguments against McKitt's other Count I claims, but McKitt failed to respond. *Celotex Corp.*, 477 U.S. at 322 (explaining that, after the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial). For example, McKitt did not respond to the Board's argument that his disparate discipline claim for the sleep reprimand is time-barred. He has not responded to the Board's arguments that the sleep reprimand was not an adverse employment action, that McKitt failed to provide similarly situated white agents who were treated more favorably, or that discipline for violating the rules cannot show pretext. He has not shown any comparators for his discriminatory pay, assignment, discipline, evaluations, or transfer claims. To the extent that McKitt has not addressed the Board's well-supported arguments concerning his pay, assignments, discipline, evaluations, and transfers claims, the Board is entitled to judgment as a matter of law on those claims. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). The court turns now to McKitt's failure to promote claims, the warehouse assignment, and his racially hostile work environment claim.

### a.  McKitt's Failure to Promote Claims

> *1. McKitt's Title VII promotion claims related to the promotions of Chandler, Wilson, Winters, Gruhn, Roberts, Mackey, Humphrey, and Holston are time-barred.*

For a court to consider a Title VII claim, "a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred." *Pijnenburg v. W. Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001) (citing 42 U.S.C. § 2000e-5(e)(1)). A filing with the EEOC is "a requirement that, like a statute of limitations, is subject to waiver and estoppel." *Zipas v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). One area where "strict compliance with Title VII['s filing requirement] is unnecessary is where the plaintiff has filed a charge with the EEOC, but in her judicial action the plaintiff raises related issues as to which no filing has been made." *Wu v. Thomas*, 863 F.3d 1543, 1547 (11th Cir. 1989). "Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate," while "[a]llegations of new acts of discrimination, offered as the essential basis for the requested judicial review[,] are not appropriate." *Id.* (internal quotation omitted). As such, "[t]he proper inquiry […] is whether [the plaintiff's] complaint was like or related to, or grew out of, the allegations contained in [his or] her EEOC charge." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004). The purpose of the exhaustion requirement is to allow the EEOC priority in effecting voluntary compliance and conciliation between the parties. *Id.* at 1279.

McKitt filed his sole Charge of Discrimination on October 27, 2011. Chandler was promoted on February 27, 2009. Winters was promoted in February of 2009. Wilson was promoted on May 12, 2009.  Gruhn was promoted on January 12, 2010. Roberts was promoted

on May 29, 2010. Mackey and Humphrey were promoted on November 23, 2011. Holston was promoted on July 16, 2012. Chandler, Wilson, Winters, Gruhn, and Roberts' promotions preceded the Charge of Discrimination by more than 180 days. Mackey, Humphrey, and Holston's promotions all followed McKitt's Charge, and McKitt has not presented any evidence of an Amended Charge in this case. Furthermore, McKitt has not identified any reasons for tolling the filing requirement in this case, nor has he shown a waiver by the Board or a reason for applying estoppel. In addition, McKitt cannot rely on Aaron's EEOC Charge in this case, as he contends. Aaron's August 9, 2010 Charge of Discrimination only mentioned Roberts' promotion. Moreover, the Charge did not mention any issues that McKitt had with Roberts' promotion. Thus, Aaron's August 9, 2010 Charge did not provide the Board notice of McKitt's claims concerning these promotions, and McKitt's claims cannot "piggy-back" on Aaron's claims. *See Wu v. Thomas*, 863 F.2d 1543, 1547–48 (11th Cir. 1989). Thus, all of these Title VII failure to promote claims are time-barred.

### 2. *McKitt's failure to promote claims related to Myers and Hayes' promotions fail.*

To state a prima facie case of intentional discrimination in a failure to promote case, the plaintiff must demonstrate "1) that she belongs to a protected class; 2) that she was qualified for a job for which the employer was seeking applicants; 3) that, despite her qualifications, she was rejected; and 4) that, after her rejection, the employer continued to seek applicants or filled the position with a person outside of the plaintiff's protected group." *Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1135 (M.D. Ala. 2003). For the purposes of this motion, the Board concedes that McKitt has shown a prima facie case for this claim. However, the Board argues that McKitt

cannot rebut its legitimate, nondiscriminatory reasons for choosing Myers and Hayes for sergeant promotions over McKitt.

In July of 2011, the Board had three sergeant positions to fill: an undercover position in Montgomery, a position in Birmingham, and a position in Huntsville.[4] In filling the positions, Rogers decided to use an interview panel. The interview panel consisted of Captain Richardson, an African-American male, Lieutenant Turner, a white female, Captain Taylor, a white male, Lieutenant Chandler, a white male, and Captain Hatfield, a white male. After determining that there would be an interview process, Rogers notified all of the eligible candidates from the Certificates of Eligibles. After interviews were conducted, including an interview with McKitt, the panel recommended Hayes for the Birmingham position, Myers for the undercover position in Montgomery, and another white male agent for the position in Huntsville. Based on Rogers' knowledge of the candidates and of the positions to be filled, Rogers accepted the recommendations and forwarded them to the Administrator, Mac Gipson. Although McKitt was on the Certificates of Eligibles for both the Birmingham and Montgomery positions, neither the interview panel nor Rogers recommended him. The Administrator made the ultimate decision to appoint the three candidates to the recommended positions.

The Board points to several legitimate, nondiscriminatory reasons for choosing Myers and Hayes over McKitt. First, both candidates were chosen through a racially- and gender-diverse interview panel that examined each applicant and provided one joint recommendation to Rogers. Second, Myers was a better candidate for the undercover program position in Montgomery. One of the interviewers was also the supervisor for Myers' position, and he testified that he preferred Myers over McKitt because Myers had up-to-date narcotics experience

---

[4] McKitt was not an applicant for the Huntsville position.

that McKitt lacked. (Doc. # 39-7 at 200:6–16.) According to Rogers, "[o]f the twenty-two candidates who interviewed, Myers had the most extensive experience working narcotics and undercover operations." (Doc. # 27-2 ¶ 38.) He would be able to use this narcotics experience in training, supervising, and coordinating agents in the undercover program. (*Id.*) Third, Hayes was a better candidate for the Birmingham position. Hayes had experience in Birmingham, the city in which he was promoted. He also had extensive experience with narcotic enforcement work. Before working with the ABC Board and the Montgomery Police Department, Hayes worked with a regional Drug Enforcement Agency Drug Task Force in Ohio. (Doc. # 27-2 ¶ 39.) According to Rogers, "Hayes's dedication, work ethic, initiative, flexibility, extensive levels of training and experience, leadership qualities, and respect from his peers made him the ideal candidate for promotion to the [Birmingham] Sergeant position." (*Id.*) Based on these traits, and based on others' recommendations and Rogers' personal knowledge of the particular positions, Rogers accepted the interview panel's recommendations.

Furthermore, the Board argues that McKitt's lackluster responses to interview questions were legitimate, nondiscriminatory reasons for choosing Hayes and Myers. McKitt stated that he expected to be retired within five to ten years. In addition, he said that people have mistaken his demeanor as a lack of motivation. Finally, when asked whether he would report a fellow employee's dishonesty as a supervisor, McKitt responded that he would not as long as the activity was not criminal. Thus, the Board has shown legitimate, nondiscriminatory reasons for choosing Hayes and Myers over McKitt, and the burden shifts to McKitt to demonstrate pretext.

McKitt has failed to show that the Board's stated reasons for choosing Myers and Hayes were pretext for discrimination. McKitt argues that he was a superior candidate based on his greater seniority, military experience, and formal education. Moreover, McKitt points to alleged

past register manipulation as proof that the Board can promote whom it wants, whenever it wants. However, there is no indication of register manipulation in order to promote Hayes and Myers. Instead, McKitt interviewed just like Hayes, Myers, and everyone else. In addition, subjective preference alone can be a legitimate, nondiscriminatory reason for choosing a candidate for a supervisory or professional position. *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007). "Federal Courts 'do not sit as a super-personnel department that reexamines an entity's business decisions'" but instead only examine "whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)). Because McKitt has not shown "such weaknesses, implausibilities, inconsistencies or contradictions" in the Board's proffered legitimate, nondiscriminatory reasons for choosing Hayes and Myers over himself, the Board's Motion for Summary Judgment on that claim is due to be **GRANTED**. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)).

### b. McKitt's Title VII Warehouse Assignment Claim

McKitt also sets forth several allegations concerning his seven-month assignment to the ABC warehouse from December 2009 to June 2010. The court will address McKitt's § 1981 warehouse assignment claim against Rogers later, but McKitt's Title VII assignment claim is time-barred. McKitt raised this claim in his EEOC Charge on October 27, 2011. As with several of McKitt's promotions claims, McKitt's warehouse assignment ended more than 180 days before the filing of the EEOC Charge. In fact, the warehouse assignment ended more than one

year prior to the date McKitt filed his EEOC Charge. Because McKitt has not exhausted the administrative remedy for his Title VII warehouse assignment claim, the claim is barred and the Board is entitled to summary judgment on that claim.

### c. McKitt's Hostile Work Environment Claim

The prima facie case for a hostile work environment claim requires the plaintiff to show "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

McKitt largely collapses his racially hostile work environment claim and a retaliatory hostile work environment argument into the same analysis. However, Count I is based only on race, and Count II, which is McKitt's Title VII retaliation claims, is concerned with McKitt's protected conduct. In presenting its argument on McKitt's racially hostile work environment claim, the Board takes issue with the third, fourth, and fifth elements of the hostile work environment prima facie case. This court only addresses the third and fourth elements.[5] For the

---

[5] The Board in its brief, and McKitt in his response brief, devotes substantial space to analyzing the Supreme Court's recent decision in *Vance v. Ball State University*. In that case, the Supreme Court clarified the test for determining whether an individual is a supervisor for Title VII purposes. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013). Determining who qualifies as a supervisor is important for an employer's *Farragher–Ellerth* defense. However, McKitt's hostile work environment claim fails for other reasons, and the court thus does not need to determine who the supervisors were in this case.

reasons stated below, the Board's Motion for Summary Judgment on McKitt's Title VII hostile work environment claim is due to be **GRANTED**.

As pieced together from the submissions of both parties, McKitt has not pointed to sufficient harassment from which a reasonable jury could conclude that there was a sufficiently severe or pervasive level of racial harassment in the workplace to support this claim. With regards to explicitly racist remarks or indicia, McKitt was aware of only a few instances. Aaron heard Folmar once refer to an African-American male as "a monkey" in the warehouse, but she could not remember at what time. (Doc. # 26-3 at 449:20–23.) Hatfield said that he had heard warehouse employees use the "n-word," but he could not remember the exact context of the slurs or at what times they were used. (Doc. # 39-7 at 126:3–13.) Similarly, Hatfield recalls Rogers using racial slurs, but he could not remember the context, times, or frequency of those situations either. (Doc. # 39-7 at 126:17–128:4.) Moreover, Hatfield heard Folmar use racial slurs, but he could not remember at what time. (Doc. # 39-7 at 199:2–7.) Hatfield did say that he remembered Folmar commenting that Richardson was hired to communicate with African-American legislators, but he did not say when Folmar made this comment. (Doc. # 39-7 at 70:11–71:14.) Rogers admitted to using racial slurs, but said it was not habit or custom. (Doc. # 39-4 at 84:23–85:13.) The only specific instance Rogers recalled of using a racial slur consists of a recollection, substantiated by Hill, that he used the "n-word" in reference to an African-American female job applicant sometime in 2010. (Doc. 39-4 at 85:14–89:11; Doc. 39-8 at 12:3–22.) Rogers also used the "n-word" when quoting a line from a movie to McKitt. (Doc. # 47-1 ¶ 22.) This is the only instance of racist language uttered in McKitt's presence. Hill also heard Rogers say that Plaintiffs in another case were "N words [who] wanted something for nothing." (Doc. # 39-8 at 17–19.) Turner heard Rogers use the "n-word" once without mentioning a specific time, and she

said the word was only used at Perry's request in quoting a story Perry had told. (Doc. 39-6 at 205:2–7.) Perry said that she saw Confederate battle flags on personal vehicles but she did not mention at what times. (Doc. # 27-34 at 130:7–13.) Perry also heard a reference to the Ku Klux Klan during a conversation about the "n-word" with Goolsby and another ABC employee, but she did not mention on what date this conversation happened. (Doc. # 27-34 at 130:7–131:16.) Parker testified that she heard Rogers say that District Ten was becoming "too dark" when discussing where to place a new African-American recruit, but Parker did not specify the exact date of this comment. (Doc. # 39-2 at 38:2–8.) She also said Rogers did not want her to consider an African-American female applicant too favorably "because she had a reputation of being one of those uppity black bitches." (Doc. # 39-2 at 82:21–83:5.) As stated, only one of these was in McKitt's presence, and he is vague as to when and under what circumstances he was told about the others.

As other instances of alleged harassment, McKitt identifies several examples in his statement of the facts. He argues that the Board's use of a GPS in June of 2008 was harassment because "the ABC Board simply accepted a complaint from [McKitt's] white neighbor at face value." (Doc. # 38 at 9.) He believed the one-week warehouse assignment in December 2008 was harassment. He claims that he, Aaron, and Taylor were subjected to a pattern of racial harassment while Turner supervised District Ten and that he was aware of Aaron and Taylor's treatment. (Doc. # 38 at 20.) McKitt believes he was being harassed when Turner reprimanded him on November 23, 2009 for the stated reason of sleeping on the job. (Doc. # 39-1 at 255:3–13.) During the same time that Turner arrived at District Ten, Holston also arrived at District Ten. As soon as he arrived, according to Aaron, he told her that Davis and Rogers told him to spy on her. In addition, he stated that he knew people thought he was there to spy on others.

McKitt considered this to be harassment. Beginning on December 7, 2009, McKitt believes he was racially harassed when he was given the seven-month-long warehouse assignment as punishment for sleeping on the job. (Doc. # 38 at 26.) He believes that the alleged July 2009 register manipulation in order to get Chandler and Wilson promoted to lieutenant positions constituted racial discrimination. (Doc. # 38 at 34.) He alleges generally that placing Turner on the interview panel for promotions constituted racial harassment. He points to a change in the office's breakfast rules on December 17, 2010 as discriminatory. (Doc. # 38 at 41–42.) He believes his reassignment to Bullock County on January 1, 2011 was racial harassment. (Doc. # 38 at 42.) Moreover, he believes that the District Ten meeting on January 7, 2011 constituted racial harassment because of the Board's reaction to Aaron's complaints. The harassment continued until January 27, 2011 when the final counseling form was issued. Furthermore, he says Davis racially harassed him when he yelled at McKitt for not wearing recording equipment during an undercover operation. He believes Holston's comment that Holston was "sick and tired of people that don't think they have to do nothing just because they file lawsuits" was harassment. (Doc. # 39-1 at 150:22–151:7.) He says that the counseling he received from Collins on July 29, 2011 for using bad language was racial harassment. (Doc. # 38 at 50–51.) He believed a lower-than-usual evaluation score and a subsequent counseling session with Richardson on September 14, 2011 were harassment. (Doc. # 38 at 52–53.) He believes that Wilson, Chandler, and Winters' promotions in May of 2009 were harassment. He states that Holston's promotion on July 16, 2012 was racial harassment. (Doc. # 38 at 56.) Moreover, he says Rogers' communications with Carson over the acting sergeant program constituted racial harassment. Finally, McKitt believes that Holston's discussion with Aaron over a payment reimbursement issue constituted racial harassment. (Doc. # 38 at 58.)

McKitt also says that he was aware of other parties' harassment and that this contributed to his own hostile work environment experience. Specifically, he was concerned over Hill's removal after Hill complained that Taylor and McKitt were assigned to the warehouse because of their race. Moreover, he points to Turner's decision to discipline Taylor for not having sufficient cases despite not allowing agents to leave the office to make new cases. He also discussed Taylor's discipline for having a dent in his state-issued vehicle's door on November 18, 2009. He was aware of Taylor's resignation and subsequent failure to rescind it. Furthermore, he was concerned about Holston arriving in the office to watch over everyone. McKitt cites his contention of Rogers' practice of pre-selecting individuals for promotions and Goolsby's apparent acquiescence in this scheme. Furthermore, he was aware of the Board's surveillance of Aaron after she filed her EEOC Charge. Finally, he knew of Lard's arrest, and this contributed to his hostile work environment because other investigations of white employees had been covered up. In sum, all of this, to McKitt, meant that "[t]he African-American employees of the ABC Board reasonably and correctly felt they were under siege." (Doc. # 38 at 87.)

Finally, McKitt points to several other general events that could form part of the racially hostile work environment at the ABC Board. During the seven-month warehouse assignment, Davis told McKitt that he could not use the golf cart or office at the warehouse, but McKitt saw white agents use both, although he does not show that Davis authorized or knew about that. (Doc. # 39-1 at 320:23–321:19.) McKitt says that he is making a claim arising from his September 2, 2010 performance appraisal, but he does not state what issues he had with the evaluation, and he does not discuss this claim in his brief. (Doc. # 144:5–145:12.) McKitt believes that Davis and Holston scrutinized both him and Aaron more heavily after Aaron's SPD hearing. Moreover, McKitt believes that Davis and Holston continuously harassed them after

McKitt's seven-month-long warehouse duty ended. McKitt pointed to a grievance letter in which Holston wrote that he had complained to Collins in front of other agents as to African-American agents' more favorable treatment with workloads. (Doc. # 43-5 at 2.) With Davis, however, McKitt only states that his work was criticized more than white agents' work, and his paperwork was returned with more red marks than white agents. McKitt also points to a long list of promotion decisions in which white candidates were chosen over McKitt and other African-American candidates.[6] However, he presents no evidence of racial animus with any of these promotions, especially in light of the Board's arguments that each candidate was chosen based on superior qualifications. McKitt also references Rogers' request that McKitt fill out a fitness-for-duty form in September of 2008. Patton subsequently required McKitt to return home until the form was completed. After McKitt was reprimanded for sleeping on the job, he says that Turner and Davis quizzed him about his health. On January 1, 2010, Davis instituted a new rule requiring all agents to keep hourly logs of their time. At some unspecified time thereafter, Davis questioned McKitt for more than an hour on a four-minute discrepancy between McKitt and Aaron's log books. On August 8, 2010, Richardson met with McKitt and told him that he was going to give McKitt a few months to get organized but that Richardson would be watching McKitt. Finally, in Rogers' September 21, 2011 meeting with McKitt, Rogers used a racial slur in quoting a movie.

---

[6] McKitt identifies the following promotions in his arguments: Chandler and Wilson's promotions to sergeant positions in late February 2009; Winters' promotion to sergeant in May of 2009; Gruhn's promotion to sergeant in January of 2010; Roberts' promotion to sergeant on May 29, 2010; Chandler and Wilson's promotions to lieutenant positions in July 2010; Myers and Hayes' promotions to sergeant positions in September 2011; Mackey and Humphrey's promotions to sergeant positions in November 2011; and Holston's promotion to sergeant in July 2012.

After considering all of the evidence presented to the court, these alleged instances do not constitute the level of severe or pervasive harassment necessary to support a hostile work environment claim. In particular, while he subjectively perceived his work environment to be racially hostile, he has not shown that the alleged harassment was objectively severe or pervasive. Concerning the instances of racist language and indicia, McKitt personally witnessed only one arguably racist remark, and, while having been told by others at some time of several other instances, the other comments listed by both parties represent only sporadic, isolated incidents. In the aggregate, McKitt has not shown that the racist remarks were frequent. Moreover, he has not shown that they were physically threatening or humiliating nor that they interfered with his job performance. Instead, the racist language in this case consists of isolated, sporadic instances of mere offensive utterances, mostly not in his presence, and as such McKitt has not succeeded at using this as a basis for his hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 755, 788 (1998)

Furthermore, even when the racist language is taken into account with McKitt's scattered allegations of harassment, he still has not shown a sufficiently severe or pervasive level of harassment. Instead, once again, although he seems to have subjectively perceived every unfavorable action taken as to him to have been taken because of his race, he fails to show how these events combined to form an objectively reasonable perception of being race-based and of severity or pervasiveness. "[T]o be actionable, [the] behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.* (internal quotations and alterations omitted). In examining objective severity, the court considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a

mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* As the Supreme Court has stated "teasing, offhand comments and isolated incidents do not constitute discriminatory changes in the terms and conditions of employment." *Satchel v. Sch. Bd. Of Hillsborough Cnty.*, 251 F. App'x 626, 630 (11th Cir. 2007) (citing *Faragher*, 524 U.S. 755, 788 (1998)). The inquiry is whether "[a] jury reasonably could find […] that a meaningful portion of the allegedly offensive conduct in the office contributed to conditions that were humiliating and degrading […] and therefore may have created a discriminatorily abusive working environment." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010).

McKitt has not identified racial animus in any of these decisions. For example, there is no indication of the frequency with which McKitt saw white agents using the golf cart and office at the warehouse, whether the white agents' use preceded Davis' conversation with McKitt, or whether Davis ever authorized anyone to use the golf cart and office. Moreover, he has not presented evidence of any disparate application of the generalized policies that Davis disseminated to the District Ten Enforcement Division. McKitt also has not identified examples of how the general rule forbidding sleeping on the job was discriminatorily applied. He has not shown evidence of why the promotions were based on race rather than on the candidates' objective qualifications. In addition, he has not rebutted the Board's evidence that GPS devices were used in internal investigations against both whites and African-Americans. In short, beyond conclusory allegations, McKitt does not present any evidence of actual racial animus with these instances of harassment.

Furthermore, McKitt has not shown how these instances of harassment were objectively severe or pervasive. The instances that McKitt raises occurred over four and a half years. None

of these instances were physically threatening or humiliating to McKitt. In addition, he has not explained how these instances were objectively severe. For example, there is no discussion of how Davis' scrutiny was somehow severe, nor is there any indication of the severity attached to Hill being transferred. Concerning promotions, the Board offered evidence of two white agents, Green Fountain and David Taylor, who have each been on more Certificates of Eligibles than McKitt, have not been promoted, and still work as Enforcement Agents for the Board.[7] Finally, McKitt does not indicate in any way how the alleged instances unreasonably interfered with his job performance. Instead, the only evidence presented by both parties indicates that McKitt did not have any obstructions to his job performance based on his race. Based on these factors, McKitt has not shown that the alleged harassment constituted objectively severe or pervasive harassment that altered the terms or conditions of his employment. Thus, McKitt's hostile work environment claim fails, and the Board's Motion for Summary Judgment on that claim is due to be **GRANTED**.

### B. Count II

In Count II of McKitt's Complaint, entitled "Plaintiff Stephen McKitt's Claims of Retaliation against the ABC Board (State of Alabama) in Violation of Title VII," he alleges he "was retaliated against in violation of Title VII for opposing discrimination by, *inter alia*, testifying in support of African American agent Valencia Aaron in a State Personnel Board Hearing on her grievance, which alleged race discrimination by the ABC Board, Rogers, and

---

[7] Green Fountain began his career with the Board in 1990 and has been on thirty-four Certificates of Eligibles for promotion to a sergeant position. David Taylor has been with the Board since the same year as McKitt, 1994, and has been on sixteen Certificates of Eligibles (one more than McKitt). Neither has been promoted, and both continue to work at the Board.

Turner. Plaintiff McKitt was subject to retaliation in the areas of promotion, discipline, jobs and work assignments, transfers, retaliatory harassment, and all other terms or conditions." (Doc. # 1 ¶ 61.) McKitt states in his brief that "[t]he adverse action which affected the terms and conditions is the racial harassment and retaliatory harassment which constituted a hostile work environment." (Doc. # 38 at 73–74.) The court will consider McKitt's alleged discrete retaliatory acts both on their own and as part of an analysis concerning whether a retaliatory hostile work environment existed. However, despite various statements in McKitt's deposition that seem to confuse the issue, the court only examines those instances of alleged retaliation that occurred after McKitt's protected conduct.

### a.   Discrete Acts of Retaliation

Title VII prohibits retaliation in the employment context by making it "an unlawful employment practice for an employer to discriminate against any of his employees […] because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "A prima facie case of retaliation contains three elements: first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002) (quotation omitted). An action is materially adverse if it might dissuade "a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In the past, the Eleventh

Circuit has construed "the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quotation, ellipsis, and alteration omitted). A causal connection has been established if the plaintiff shows that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (quotations and alterations omitted). "For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *Id.* (quotations omitted). Recently, the Supreme Court has declared that the ultimate issue is whether the retaliation would not have occurred but for the protected conduct. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

The only instances of protected conduct mentioned by either McKitt or the Board are McKitt's testimony in Aaron's SPD hearing on December 16, 2010 and McKitt's EEOC Charge filed on October 27, 2011. Although vague, the court has gleaned the following instances of alleged retaliation from McKitt's arguments.

McKitt points to several alleged instances of retaliatory harassment that occurred after he testified in Aaron's SPD hearing on December 16, 2010 and after he filed his EEOC Charge on October 27, 2011. First, McKitt states that "Rogers, through Lieutenant Davis[,] scrutinized Agent McKitt and Agent Aaron and allowed Agent Holston—who was later promoted to Sergeant—to harass Agent McKitt and Agent Aaron on a daily basis." (Doc. # 38 at 83.) In particular, Davis would review McKitt and Aaron's work very closely, making multiple corrections that often were not made in white agents' reports and which were frequently incorrect. Second, after McKitt complained that Davis and Holston's harassment was race

discrimination, "Rogers failed to take any action to investigate." (Doc. # 38 at 83.) Third, McKitt alleges generally that placing Turner on the interview panel for later promotions constituted harassment and retaliation. Fourth, McKitt viewed the Board's reactions to Aaron's complaints in the District Ten meeting as harassment and retaliation. The retaliation and harassment continued through January 21, 2011 when the final counseling form was issued. Finally, after McKitt's Charge, "Rogers noticeably took Agent Holston's side when he complained and directed [Carson] to disavow even the appearance of any advantage from any acting supervisor." (*Id.*)

Moreover, McKitt generally alleged several other instances of harassment that occurred after he testified in Aaron's SPD hearing and after he filed his EEOC Charge and which could have contributed to McKitt's perception of a retaliatory hostile work environment. Specifically, McKitt points to several promotions that occurred after he testified in Aaron's SPD hearing. Myers and Hayes were promoted on September 7, 2011. Mackey and Humprey were promoted on November 23, 2011, almost one month after McKitt testified at the SPD hearing. Holston was promoted on July 16, 2012. Furthermore, the day after McKitt testified in the SPD hearing, Davis sent an email to the Enforcement Division that no one would be allowed to eat breakfast during work hours anymore. In addition, on January 4, 2011, McKitt's assignment was changed from Montgomery County to Bullock County. Montgomery County was subsequently assigned to an agent with less seniority than McKitt. Moreover, Holston commented at some unspecified time in 2011 that he was "sick and tired of people that don't think they have to do nothing just because they file lawsuits." (Doc. # 39-1 at 150:22–151:7.) Holston also complained to Collins in front of other agents about the differing levels of work between white and African-American agents. (Doc. # 43-5 at 2.) Holston was not disciplined for insubordination following these

comments to Collins. Furthermore, McKitt believes that Holston's discussion with Aaron in October 2012 over a payment reimbursement issue constituted racial harassment. On July 14, 2011, the Board announced that two white sergeants were given active lieutenant duties. On August 31, 2011, the Board announced that both of those white sergeants had been promoted to permanent lieutenant positions. McKitt considered the sergeants' pre-selection for assignments and their subsequent promotions were harassment. Moreover, Collins counseled McKitt on July 29, 2011for using abusive language while speaking to Collins, and McKitt considered this to be harassment. On September 21, 2011, Davis gave McKitt a performance evaluation that stated McKitt met Davis' standards. However, McKitt thought that this evaluation did not match his job performance. Richardson subsequently met with McKitt to discuss the evaluation, and McKitt said that the score, combined with the meeting, constituted harassment. In addition, McKitt cites an instance where Davis yelled at him for not wearing recording equipment during an undercover operation. Undercover agents get patted down in such situations, so McKitt did not wear recording equipment. McKitt believed he was racially harassed when Davis yelled at him. Finally, after Richardson and McKitt met, Rogers met with McKitt. In the meeting, Rogers quoted a line from *Full Metal Jacket* that contained the "n-word" and other racial epithets.

McKitt cannot show the causal connection between the alleged retaliatory acts and his protected conduct. Specifically, with retaliatory acts that occurred more than three months after McKitt's testimony in Aaron's SPD hearing and after he filed his EEOC Charge, McKitt cannot show the close temporal proximity required for causation. This is true for Richardson's counseling in September of 2011, which occurred nine months after Aaron's hearing and one month before McKitt filed his EEOC Charge. There is also no close temporal proximity with Holston's promotion in July 2012, which occurred nine months after McKitt filed his EEOC

Charge. Finally, McKitt cannot show that, but for his protected conduct, the alleged retaliatory acts would not have happened. Especially with Davis' new office rules, McKitt cannot show that, but for his protected conduct, the new rules would not have been enacted. Rather, Davis stated that the new rules were to help the office run better. Furthermore, Davis' new rules applied uniformly to all agents, regardless of race, and McKitt has not provided any evidence of discriminatory application of these rules. Although McKitt states that he has shown causation because all of the prior scrutiny and harassment intensified after his protected conduct, he has not explained or compared any examples of pre- and post-protected conduct harassment. As such, McKitt has not shown that the alleged retaliatory acts would not have occurred but for his protected conduct.

Second, McKitt cannot show that Davis' increased scrutiny, new office rules, or lateral transfer to Bullock County constituted a materially adverse employment action for a retaliation claim. An adverse action is only material if it might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Such adverse actions must be accompanied by some tangible harm to the protected employee. *See Webb–Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1031 (11th Cir. 2008). In this case, McKitt has not identified any tangible harm arising from Davis' closer scrutiny. He has not shown any loss in pay, classification, or benefits from Davis' review of his paperwork. Moreover, McKitt has not identified any tangible harm associated with being denied an extra ten minutes for breakfast in the morning. At most, Davis' new rules and scrutiny constituted the type of "petty slights, minor annoyances, and simple lack of good manners" that would not deter a reasonable employee from complaining to the EEOC. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 68. Finally, McKitt cannot show that he suffered any tangible

harm from his transfer to Bullock County. McKitt did not change offices; rather, he was still based in District Ten. Furthermore, he has not identified any loss of pay, benefits, or prestige from the move. Thus, McKitt has not shown that his lateral transfer or any of Davis' other actions constituted materially adverse employment actions.

### b.  Retaliatory Hostile Work Environment

In June of 2012, the Eleventh Circuit joined other circuits in recognizing a cause of action for a retaliatory hostile working environment. *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). To establish a claim under this cause of action, a plaintiff must show the creation of a hostile work environment in retaliation for protected conduct. *See id.* at 1311. Thus, the hostile work environment is the "adverse employment action" for the purposes of the retaliation prima facie case.

"To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two." *Id.* The prima facie case for a hostile work environment claim requires the plaintiff to show "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability." *Miller*, 277 F.3d at 1275.

36

"To establish a hostile work environment claim under Title VII, the plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gowski*, 682 F.3d at 1311 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). As discussed above, "the requirement that the harassment be severe or pervasive contains an objective and a subjective component." *Id.* at 1312. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.* (internal quotations and alterations omitted). Four factors are considered to determine objective severity: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employer's job performance. *Id.* (internal quotations omitted). The court must examine all of the circumstances to determine whether a hostile work environment was created. *Id.*

"Discrete acts cannot alone form the *basis* of a hostile work environment claim." *Id.* (emphasis in original). However, discrete acts can be considered by a jury as part of a hostile work environment claim. *Id.* at 1213. "A hostile environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). As with other retaliation claims, the ultimate question is whether the employee would not have faced the work environment but for his or her protected conduct. *See id.*; *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

Much like with McKitt's racially hostile work environment claim, McKitt fails to identify how the severity or pervasiveness of the alleged retaliatory acts created an objectively hostile work environment. Even taking all of McKitt's alleged acts together, without considering whether they are causally connected to any protected conduct, McKitt has only alleged an infrequent number of instances. Furthermore, he has not identified how any of the alleged acts were severe. He has not identified how any of the acts were physically threatening or humiliating. Finally, and as discussed above, McKitt does not show that his work was unreasonably interfered with because of the alleged acts of retaliation. Because McKitt fails to show any of the factors contributing to an objectively severe or pervasive retaliatory hostile working environment, McKitt's claim on this basis fails, and the Board is entitled to judgment as a matter of law.

Moreover, McKitt has not shown that the alleged retaliatory hostile work environment would not have occurred but for his protected conduct. First, McKitt states that he can show causation because the retaliation intensified after he engaged in protected conduct. However, he does not provide any explanations or comparisons to show that any of the harassment was increased as a result of his protected conduct. Second, he does not make any arguments concerning the Board's legitimate reasons for taking many of the alleged actions. For instance, McKitt does not refute any of the qualifications the Board asserts it used in making promotion selections. McKitt also does not rebut Richardson's legitimate reasons for counseling McKitt about his job performance. Instead, McKitt only states that he thought the evaluation score and counseling were an attempt to legitimate McKitt not receiving a promotion; he does not say that a lower-than-usual evaluation score would not warrant counseling. Third, although he argues that the cover-ups of a white employee's underage drinking offense and of Rogers' near-miss with a

driving under the influence charge show causation, this supposed comparator evidence is misplaced. McKitt argues that these instances of ignoring crimes by white personnel indicate that the Board was racist in handling Lard's case. However, this argument does not show any impact on McKitt's personal experiences other than his awareness of another African-American employee's treatment. Moreover, Lard's treatment occurred before the protected conduct in this case, so the disparate treatment of an African-American in that instance has no bearing on a retaliatory hostile work environment claim. Finally, the comparator evidence makes a flawed comparison. The two white personnel were involved with crimes of a different magnitude than Lard's alleged crime. The differing treatment can be explained on the basis of the differing severities. Thus, this comparator evidence does not support causation in McKitt's case, and McKitt has not shown causation.

## C. Count III

In Count III of McKitt's Complaint, entitled "Plaintiff Stephen McKitt's Claims of Race Discrimination and Racial Harassment in Violation of 42 U.S.C. § 1981 and the Fourteenth Amendment (Asserted via 42 U.S.C. § 1983) against Chief Jeff Rogers in his Individual Capacity," McKitt states that "Chief Rogers engaged in race discrimination and racial harassment of Plaintiff McKitt in violation of 42 U.S.C. § 1981 and the Fourteenth Amendment." (Doc. # 1 ¶ 64.)

Courts use the same *McDonnell Douglas* burden-shifting for § 1981 claims as they do for Title VII claims. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Violations of § 1981 require a showing of discriminatory intent. *Dunklin v. Montgomery Cnty. Bd. of Educ.*, 652 F. Supp. 2d 1226, 1235 (M.D. Ala. 2009).

### a. McKitt's § 1981 Failure to Promote Claims

*1. The court assumes that McKitt's promotion claim against Rogers is not barred by the four-year statute of limitations assumed to be applicable to this case.*

Claims against state actors for violations of § 1981 must be brought through § 1983. *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008). A two-year limitations period applies to § 1983 actions in Alabama. *Id.* (citing *Jones v. Preuitt & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989)). But, "a four-year statute of limitations applies to 'civil action[s] arising under an Act of Congress enacted after' December 1, 1990." *Id.* (quoting 28 U.S.C. § 1658(a)) (alteration in original). If a § 1981 claim was made possible through the enactment of the 1991 amendments to § 1981, then those claims are governed by the four-year statute of limitations. *Id.*

Without analyzing this issue, the court will assume, without deciding, for the purpose of resolving this motion, that the four-year statute applies.

*2. McKitt's § 1981 claims related to the promotions of Myers and Hayes*

For the same reasons discussed as to McKitt's Title VII claims for Myers and Hayes, his § 1981 claims against Rogers for those same promotions fail. Specifically, McKitt has failed to rebut Rogers' legitimate, nondiscriminatory reasons for choosing Myers and Hayes for

promotions. Thus, Rogers' Motion for Summary Judgment on this claim is due to be **GRANTED**.


### 3. McKitt's § 1981 claims related to the promotions of Chandler and Wilson


Although the court assumes that McKitt's § 1981 promotion claim against Rogers is not time-barred, it fails for other reasons. The analytical framework and elements of claims under § 1981 are identical to those of Title VII. *Standard*, 161 F.3d at 1330.

First, McKitt cannot show that he was eligible for the position to which Wilson was promoted. As part of the prima facie case for a failure to promote claim, the plaintiff must show that he or she is qualified for the position for which the employer is seeking applicants. *Gaddis*, 242 F. Supp. 2d at 1135. Here, it is undisputed that the Board and Rogers made promotions decisions off of Certificates of Eligibles: none of the promotions mentioned in this case involved final selections made through reallocation. Furthermore, it is undisputed that McKitt was not on the Certificate of Eligibles from which Wilson was chosen for his sergeant position. (Doc. # 27-1 ¶ 54.) Moreover, any allegations of register manipulation center on Chandler and Wilson's promotions to lieutenant positions; no register manipulation is alleged with regards to the sergeant promotions. Furthermore, any argument that Wilson received an unfairly advantageous placement on the Certificate due to pre-selection and assignment of additional duties is more appropriately addressed in a discriminatory assignments claim. Because McKitt was not on the list of persons eligible for promotion to Wilson's position, McKitt was not eligible for the position, and his prima facie case fails.

Also, McKitt's claim fails because he has not presented any evidence of racial animus in deciding to promote Chandler and Wilson. Specifically, McKitt has not argued or offered any evidence supporting a finding that Chandler and Wilson were promoted because they are white. McKitt also has not shown evidence supporting a finding that he was not promoted because he is African-American. To the contrary, Rogers proffered Chandler and Wilson's relative qualifications with information services and equipment management, respectively, as legitimate, nondiscriminatory reasons for assigning different duties. For the same reasons that Rogers assigned duties to Chandler and Wilson, he also promoted them to sergeants. Because McKitt has not rebutted the legitimate, nondiscriminatory reasons for Rogers assisting with Chandler and Wilson's promotions, and because Taylor has not shown any racial animus with these promotions, McKitt's claim fails.

Furthermore, McKitt's claims relating to Chandler and Wilson's promotions to lieutenant positions fail because he cannot show he was qualified for the particular position. As part of the prima facie case in a failure to promote claim, the plaintiff must show that he was qualified for the particular position. *Gaddis*, 242 F. Supp. 2d at 1135. However, it is undisputed that McKitt was never eligible for promotion to lieutenant because he was never a sergeant. Thus, any claim arising from Chandler and Wilson's promotions to lieutenant fail as a matter of law.

### 4. McKitt's § 1981 claim related to the promotion of Winters

McKitt was not qualified for promotion to Winters' position because McKitt was not on a Certificate of Eligibles for that position. As discussed with Wilson, a plaintiff must show that he or she is eligible for promotion to the particular position for which applicants are being sought.

*Gaddis*, 242 F. Supp. 2d at 1135. The promotions in this case all involved selections from Certificates of Eligibles. There is no indication of any final promotion decision being made through reallocation. Thus, the undisputed evidence is that a candidate had to be on the Certificate of Eligibles generated for a given position in order to be considered. McKitt argues against this reasoning by pointing to alleged register manipulation by Rogers and Goolsby in order to promote Chandler and Wilson to lieutenant positions. McKitt does not show that there was any register manipulation in the decision to promote Winters. Moreover, McKitt does not present any evidence of pre-selection and additional duties for Winters' position. Thus, the undisputed evidence is that McKitt was not on the Certificate of Eligibles for the position ultimately filled by Winters. (Doc. # 27-1 ¶ 54.) As such, McKitt has not shown that he was eligible for that position, and his prima facie case fails.

### *5. McKitt's § 1981 claim relating to the promotion of Gruhn*

McKitt concedes that Rogers was not personally involved in the decision to promote Gruhn. (Doc. # 38 at 65.) Thus, McKitt's § 1981 claim against Rogers for promoting Gruhn fails as a matter of law. *See Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp. 2d 1334, 1355–56 (S.D. Ala. 2010) (requiring a plaintiff to show that the state actor defendant was causally linked to the discrimination).

### *6. McKitt's § 1981 claim relating to the promotion of Roberts*

McKitt has failed to rebut Rogers' legitimate, nondiscriminatory reasons for promoting Roberts to the Enforcement Training Coordinator ("ETC") position. As its legitimate, nondiscriminatory reason for choosing Roberts for the enforcement training coordinator position, Rogers pointed to the relative qualifications of Roberts that made him a more attractive choice for the position than McKitt. Specifically, in a memorandum from Rogers to Goolsby, Rogers sets out the following reasons for selecting Roberts for the position: nine years of police firearm certification; five years of investigative experience with the Montgomery Police Department; four and a half years as a certified FBI firearms instructor; experience in multiple districts as an ABC Agent; experience as a lead firearms instructor for the ABC, including supervisory experience over eighteen other firearms instructors; and experience with the ABC Drug Unit. (Doc. # 27-1 at 33.) In addition, Rogers said that he personally assigned Roberts to his agent positions and that, during Roberts' involvement as an agent, Rogers heard little or no criticism of Roberts' job performance. (*Id.*) McKitt has not presented evidence of similar qualifications. While subjective preference alone can be a legitimate, nondiscriminatory reason for choosing a candidate for a supervisory or professional position, *Springer*, 509 F.3d at 1349, it is clear here that the chosen candidate had concrete, objective firearm qualifications and supervisory experience over firearms instructors that made him a reasonable choice. Because Rogers articulated a legitimate, nondiscriminatory reason by arguing that he chose a firearm training instructor with extensive experience, the burden shifts to McKitt to show pretext.

McKitt fails to show that Rogers' legitimate, nondiscriminatory reason for choosing Roberts as the enforcement training coordinator was pretext for discrimination. In arguing this point, McKitt discusses the Board's alleged past manipulation of the promotion registry. In particular, he states that "Roberts [was] assigned acting sergeant duties which (1) indicated that

[he was] pre-selected for promotion and (2) which arguably enhanced [his] SPD score[] and therefore [his] placement on the register and any certificates generated from the register." (Doc. # 38 at 69.) What McKitt's argument fails to show, however, is how exactly those duties possibly enhanced Roberts' promotion score. Instead, McKitt only provides one page of Roberts' examination application for the sergeant position. (Doc. # 43-29 at 2.) This one-page document does not establish anything concerning Roberts' duties. Furthermore, even if Roberts was hand-selected for promotion, McKitt has failed to show any discriminatory intent. Rather, with Roberts' past experience with firearms training, a promotion to the ETC appears to be a predictable outcome. Finally, even if some favoritism was shown to Roberts, favoritism alone is not evidence of racial discrimination. *See Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). McKitt needed to show discriminatory animus. Because he has failed to do so, and because he has not shown "such weaknesses, implausibilities, inconsistencies or contradictions" in Rogers' proffered legitimate, nondiscriminatory reason for promoting Roberts over McKitt, Rogers' Motion for Summary Judgment on that claim is due to be **GRANTED**. *Cooper*, 390 F.3d at 725; *Reeves*, 530 U.S. at 148–49.


### 7. *McKitt's § 1981 claims related to Humphrey and Mackey's promotions*


McKitt's claims against Rogers related to Humphrey and Mackey's promotions fail for multiple reasons. With Mackey's promotion, McKitt lacks any evidence that Rogers was involved with the promotion decision. Also, with both Mackey and Humphrey's promotions, McKitt has not rebutted evidence of legitimate, nondiscriminatory reasons for selecting each of them for promotion.

First, McKitt cannot show that Rogers was personally involved in the decision to promote Mackey. Instead, the record evidence indicates that Administrator Mac Gipson selected Mackey for a logistics position after being impressed with Mackey during trips through Alabama after the 2011 tornadoes. (Doc. # 27-2 ¶ 44.) Because the evidence indicates that Mackey, and not Rogers, personally made the decision to promote Mackey, McKitt cannot show that Rogers was causally linked to the alleged discrimination, and his § 1981 claim against Rogers fails. *See Page*, 702 F. Supp. 2d at 1355–56.

McKitt's claims against Rogers for Humphrey and Mackey's promotions fail for another reason. As with Chandler, Wilson, and Roberts, McKitt has not rebutted evidence of legitimate, nondiscriminatory reasons for promoting Humphrey and Mackey. Rogers points to the relative qualifications of both Humphrey and Mackey as legitimate, nondiscriminatory reasons for promoting them. Specifically, Humphrey was selected for a promotion to a store investigations position in the Central Office because he had recently been named Agent of the Year. (Doc. # 27-2 ¶ 43.) In addition, prior to joining the Board, Humphrey had twenty years of experience with the Montgomery Police Department, and he had significant experience with investigative work. (*Id.*) Furthermore, Humphrey took the initiative to study store surveillance systems. (*Id.*) This effort led to Humphrey being able to solve many store theft cases. (*Id.*) Finally, Humphrey volunteered to train others in his particular method of solving store theft cases. (*Id.*) According to Rogers, "[t]his exceptional effort made [Humphrey] the logical and ideal candidate to recommend for this vacancy." (*Id.*)

In addition, Rogers articulated several reasons for the promotion of Mackey to a logistics position. Mackey came with special recommendations from an ABC Captain and former Governor Bob Riley. (Doc. # 27-2 ¶ 44.) Mackey was a firearms instructor, and he showed great

initiative in his work. (*Id.*) Finally, Mackey made a favorable impression on Administrator Mac Gipson when Mackey and he traveled through Alabama after the Tuscaloosa tornadoes. (*Id.*) Gipson requested, and ultimately selected, Mackey to help Gipson with traveling through the state. As such, Mackey was promoted to a logistics position.

Because Rogers offered legitimate, nondiscriminatory reasons for the promotions of Humphrey and Mackey, the burden shifts to McKitt to show pretext. However, McKitt only argues that his seniority with the ABC Board and his military experience show that he was more qualified for promotion than Humphrey or Mackey. The court's job is not to weigh the Board's legitimate criteria in choosing candidates for positions. Rather, the test is whether "the disparities between the successful applicant's and [the plaintiff's] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Springer*, 509 F.3d at 1349 (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). McKitt has not met his burden in arguing this test. Rather, the Board has provided multiple reasonable factors in choosing Mackey and Humphrey for their respective positions. The decisions certainly are not such that "'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* Thus, Rogers is entitled to summary judgment on that claim.

### 8. McKitt's § 1981 claim related to Holston's promotion

McKitt's § 1981 claim related to Holston's promotion fails for a number of reasons. First, McKitt cannot show that he was eligible for Holston's position. Second, McKitt cannot rebut Rogers' legitimate, nondiscriminatory reason for not having promoted Holston.

First, McKitt cannot show that he was eligible for the position ultimately filled by Holston. As discussed with Wilson and Winters, a plaintiff must show that he or she is eligible for the position for which applicants are being sought by the employer. *Gaddis*, 242 F. Supp. 2d at 1135. The promotions in this case involved selections made from the Certificate of Eligibles generated for each position. There is no indication of any promotion being made solely through reallocation. Because candidates were required to be on the Certificate for the particular position in order to be considered, and because McKitt was not on the Certificate for Holston's position, McKitt cannot show that he was eligible for the position filled by Holston. Thus, McKitt's prima facie case on Holston's promotion fails.

Moreover, McKitt cannot rebut Rogers' legitimate, nondiscriminatory reason for selecting Holston instead of McKitt. Rogers proffers the legitimate, nondiscriminatory reason that he did not choose McKitt because McKitt was not on the Certificate of Eligibles for that position. Rogers also argues that the SPD's independent analysis in ranking and grading applicants precludes liability. McKitt argues that Rogers participated in Holston's promotion process because he announced at a statewide Enforcement Division meeting that he was going to request a new register "because [he thought he'd] gotten everything [he could] off of the old register." (Doc. # 39-1 at 258:2–8.) In response, however, Rogers points out that the undisputed evidence indicates that Rogers could not unilaterally order a new Certificate of Eligibles. Rather, the SPD would still play a role in determining whether a new Certificate was warranted. In addition, McKitt lacks any evidence to show that Rogers could affect the placement and grading of persons by the SPD. Thus, once Rogers requested a new Certificate of Eligibles, if McKitt had been graded highly enough by the SPD, he would have been on the new Certificate. Instead, the undisputed evidence shows McKitt was not on this new Certificate generated by the SPD.

Holston was subsequently chosen from the Certificate. Thus, based on the undisputed evidence in this case, McKitt has not shown that Rogers controlled the SPD's grading process and that this control caused the failed promotion. As such, McKitt has not rebutted Rogers' legitimate, nondiscriminatory reason for not selecting McKitt, and McKitt's § 1981 claim against Rogers on Holston's promotion fails.

### b.  McKitt's § 1981 Hostile Work Environment Claim

For the same reasons discussed as to McKitt's Title VII claim for a racially hostile work environment, his § 1981 claim against Rogers for a racially hostile work environment fails. Thus, Rogers' Motion for Summary Judgment on this claim is due to be **GRANTED**.

### c.  McKitt's § 1981 Warehouse Assignment Claim

To establish a prima facie case for discriminatory work assignments, McKitt must show that 1) he belongs to a protected class; 2) he was subjected to an adverse employment action; 3) his employer treated similarly situated employees outside his classification more favorably; and 4) he was qualified to do the job. *McDonnell Douglas Corp.*, 411 U.S. at 802. Rogers does not contest McKitt's assertion that he is in a protected class nor that he was qualified to do the particular job. In addition, with § 1981 claims, the plaintiff must show discriminatory intent. *Dunklin*, 652 F. Supp. 2d at 1235. Finally, the plaintiff must show that the state actor was causally connected to the discrimination. *See Page*, 702 F. Supp. 2d at 1355–56.

49

McKitt's § 1981 claim against Rogers related to McKitt's assignment to the warehouse from December of 2009 to June of 2010 fails for multiple reasons. First, McKitt has not identified any white agents who were caught sleeping on the job but who were subsequently either not disciplined or given a lighter punishment. McKitt's failure to provide comparators defeats his prima facie case.

Second, McKitt has not shown that the warehouse assignment constituted an adverse employment action. "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). The employee's subjective view does not control; rather, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* "[T]he mere fact that an employee dislikes his or her employer's action is not sufficient to establish the element of adverse employment action." *Smith v. Ala. Dep't of Pub. Safety*, 64 F. Supp. 2d 1215, 1221 (M.D. Ala. 1999). Moreover, "a lateral transfer that results in no loss in pay, benefits, or classification does not generally constitute an adverse employment action." *Id.* Here, McKitt has not pointed to any evidence that would indicate a serious and material change in his working conditions. Instead, all that McKitt says is that warehouse assignments are considered punitive because the warehouse is dirty, cold in the winter, and hot in the summer. McKitt has provided no evidence of any change in pay, benefits, or classification from being sent to the warehouse. Moreover, he has not presented any evidence of a serious and material change beyond his statement that he dislikes the assignment because it is considered punitive. McKitt has not shown the level of serious and material change necessary for the adverse employment action element, and his prima facie case fails.

Third, McKitt has not pointed to any evidence that Rogers was personally involved in the decision to send McKitt to the warehouse. Instead, the record evidence indicates that Turner made the decision as punishment for McKitt sleeping on the job. Although McKitt states that Rogers had Patton prepare a non-contemporaneous memorandum "in which [Patton] recalled Lieutenant Hill asking if Agent McKitt could continue to work in the warehouse because he enjoyed working there and wanted to stay in the warehouse," this alone does not show that Rogers was involved with the decision to send McKitt to the warehouse. Thus, McKitt cannot show that Rogers was causally linked to the alleged discrimination, and his § 1981 claim fails. *See Page*, 702 F. Supp. 2d at 1355–56.

Finally, McKitt lacks evidence to rebut Rogers' proffered legitimate, nondiscriminatory reason for Turner sending McKitt to the warehouse. Turner said that the warehouse assignment was punishment for McKitt falling asleep on the job. (Doc. # 39-6 at 145:23–146:7.) McKitt admitted to sleeping at the time Winters filmed him. (Doc. # 39-1 at 212:21–213:1.) Furthermore, sleeping on the job can lead to multiple levels of discipline, including immediate termination. (Doc. # 39-6 at 142:22–143:3.) Because McKitt was caught sleeping and because Turner disciplined McKitt in response, Rogers and the Board have proffered a legitimate, nondiscriminatory reason for sending McKitt to the warehouse. As such, the burden shifts to McKitt to show pretext. However, McKitt fails to make any argument or present any evidence indicating that these reasons were pretext and that the real reason for the warehouse assignment was discrimination. *Reeves*, 530 U.S. at 148–49. Instead, McKitt admits that he did the action for which he was disciplined. Thus, McKitt has failed to show pretext as to Rogers' legitimate, nondiscriminatory reason for Turner sending McKitt to the warehouse, and Rogers' Motion for Summary Judgment on that claim is due to be **GRANTED**.

## D. Count IV

In Count IV of McKitt's Complaint, entitled "Plaintiff Stephen McKitt's Claims of Retaliation in Violation of 42 U.S.C. § 1981 and the Fourteenth Amendment (Asserted via 42 U.S.C. § 1983) against Chief Jeff Rogers in his Individual Capacity," McKitt alleges that "Chief Rogers engaged in retaliation against Plaintiff Stephen McKitt in violation of 42 U.S.C. § 1981 and the Fourteenth Amendment." (Doc. # 1 ¶ 67.) For the same reasons discussed as with McKitt's Title VII retaliation claim, Rogers is entitled to summary judgment on McKitt's Count IV. Furthermore, McKitt has not shown any evidence of Rogers' personal involvement with any of the alleged instances of retaliation. Thus, Rogers' Motion for Summary Judgment on McKitt's Count IV is due to be **GRANTED**.

## V.     CONCLUSION

A great deal of McKitt's claims are based on rumors and actions in the presence of persons other than McKitt, and which are not shown to have created a hostile working environment for McKitt. He has failed to show how any employment actions justified by reasons given by the Defendants were actually based on discrimination. For all of the reasons discussed above, the court finds that there is no genuine issue as to any material fact and the Defendants are entitled to judgment as a matter of law.

The Defendants' Motions for Summary Judgment are **GRANTED**.

Done this 25th day of September, 2013.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE